## In re REMPFER.

### (216 N. W. 355.)

(File No. 5500.   Opinion filed July 9, 1927.)

1. **Attorney and Client—Attorney, Inducing Those Appearing Before His as County Judge to Pay Exorbitant Retainer Fees to Other Attorney and Advising in Matter Which Might Come Before Him, Held Guilty of Conduct Requiring Disbarment.**

Where attorney, while acting as county judge, induced certain persons pleading guilty before him to make exorbitant payments for alleged retainer fees to other attorney, and also advised as attorney in matter that might have come before him as county judge, and which later did actually come before him as such judge, he was guilty of such unprofessional and dishonorable conduct as required disbarment.

**2.    Attorney and Client—County Judge, Inducing one Appearing Before Him to Pay Exorbitant Fee to Another Attorney, Was Guilty of "Extortion" (Rev. Code 1919, § 4238).**

Attorney, using his knowledge of German language and position as attorney to induce one appearing before him as county judge to pay an exorbitant retainer fee to another attorney, held guilty of extortion within Rev. Code 1919, § 4238, irrespective of whether he was seeking to obtain or did obtain any benefit or property for himself.

**3.    Attorney and Client—Relation of Attorney and Client Is One of Highest Trust and Confidence, Requiring Utmost Good Faith.**

Relation of attorney and client is one of highest trust and confidence, requiring attorney to observe utmost good faith and not to allow his private interests to conflict with those of client.

---

Note.—See, Headnote (1), American Key-Numbered Digest, Attorney and client, Key-No. 38, 6 C. J. Sec. 40; (2) Key-No. 39, 6 C. J. Sec. 43; (3) Key-No. 63, 6 C. J. Secs. 206, 207.

Misconduct or bad faith toward client as ground for disbarment, see 2 R. C. L. 1095; 4 R. C. L. Supp. 139.

For annotations on Rev. Code 1919, Sec. 4238, see Kerr's Cyc. Code, Penal Code, Sec. 518.

Original proceedings for the disbarment of William C. Rempfer, an attorney at law. Judgment of disparment.

*Buell F. Jones,* Attorney General, and *Benjamin D. Mintener,* Assistant Attorney General, for the State.

*Lauritz Miller,* of Mitchell, for the Accused.

SHERWOOD, J.  William C. Rempfer, hereinafter called the accused, was charged with unprofessional conduct in three separate transactions. For convenience we will hereafter refer to these charges as (1) the Frederick Schuler charge; (2) the John Kroeger charge; and (3) the E. H. Doering charge.

[1]    Upon the trial, the referee found against accused on the first two charges, and in his favor on the last charge. The referee's report is now before us on a motion by the Attorney General to confirm the same, and on objections by accused to certain of the findings and conclusions of the referee. We will consider these charges in the order above named. The facts necessary to an understanding of (1) the Schuler charge, are as follows:

During all the time referred to in the complaint, accused was a duly licensed attorney at law of this state. He was also cashier

of the First National Bank of Parkston, actively attending to his duties as such cashier and maintaining his law office in said bank. In 1922 he was county judge and in 1923 state's attorney of Hutchinson county. About 15 years before this time Fred Schuler came directly from Russia to Hutchinson county. At this time he was about 43 years of age and was living with his wife and five children on a farm about 8 miles from Tripp. He had a general knowledge of the German language, but was unable to read English or speak it to any extent, and gave his testimony through an interpreter.

On August 16, 1922, three prohibition officers, Wood Smith, Chas. B. Bentliff, and J. B. Heil, made a raid on the farm occupied by Schuler. They found a boiler, still and coil, a small amount of moonshine whisky in a jug, and about 50 gallons of grape mash.

Schuler came up while the raid was in progress and asked the officers what he had better do. At least two of them told him to go to Parkston the next day and plead guilty before accused, and further told him, if he went in the next morning and pleaded guilty before accused and paid his fine, he would not be taken to federal court, and no federal charge would be brought against him. They also said accused might let him off with a minimum fine of $250 and costs. He promised to go in and plead guilty as directed.

On the next day after the raid, August 17, Wood Smith and Bentliff drove from Mitchell to Parkston, arriving there about 2 p. m. They left a complaint against Schuler with accused and told him Schuler would be in and plead guilty. Accused said as long as Schuler was coming in to plead guilty, there was no use in their staying any longer. As there was a storm coming up, they left for Mitchell almost immediately. Directly after they left, accused went into his bank and drew up a judgment and sentence against Schuler, dating it August 17, 1922. This judgment and sentence is now on file in the office of the clerk of courts of Hutchinson county, and is dated August 17th. Later and on the 17th or 18th day of August, Schuler appeared before accused, pleaded guilty, and was fined $250 and costs.

It is undisputed that, on the same day Schuler pleaded guilty he had a conference with accused in Doering's office at Parkston,

gave accused two checks, aggregating $994, then drove him to the Tripp bank, where accused collected the proceeds of these checks. The two checks above referred to were drawn by the accused while in Doering's office. One check was for $294, payable to Wm. C. Rempfer. This check was for Schuler's fine and costs. The other check was for $700, and was made payable to 78—159, which are the numbers given to the First National Bank of Parkston by the National & State Bankers' Associations, respectively. The checks were both drawn on the Farmers' & Merchants' State Bank of Tripp, hereinafter referred to as the Tripp bank. The Tripp bank paid the two checks to accused that day in one draft of $994. Schuler was discharged and went home, and accused returned to Parkston in another car.

With regard to the date on which these checks were made, there is a direct and irreconcilable conflict between the testimony of Schuler and the testimony of accused, both as to the day of the month and as to the hour of the day when Schuler came to Parkston and the time of day when Schuler and accused went to Tripp to cash the checks.. There is also a direct and irreconcilable conflict between the testimony of Schuler and the testimony of accused and Doering as to what occurred during the conference.

To make this clear, it will be necessary to give a brief summary of the testimony of Schuler and also the testimony of accused, concerning these events, and the other testimony and circumstances corroborating each.

Schuler testified, in substance, that the next day after the raid, which was August 17th, he drove from his home to Tripp. There he met Mr. Doering, the father of Dr. E. H. Doering, of Parkston. The elder Doering rode from Tripp to Parkston with Schuler. They arrived in Parkston on the afternoon of August 17th about 2 or 3 o'clock p. m., and drove directly to Dr. E. H. Doering's office. Accused was called on the telephone and came to Dr. Doering's office. Schuler and accused went into the back room for a conference. Dr. Doering was at work in another room during part of the conference, but was in the room with Schuler and accused part of the time. Schuler told accused his premises had been raided by prohibition officers, and he wanted to plead guilty and get the whole matter settled in the easiest and least expensive way possible. Accused said it would cost him

$1,000 to settle the matter, and it was absolutely necessary for him to raise this amount of money. If he failed to do so, he would have to go to jail and a federal charge would be preferred against him. In addition to that, the government would exact a revenue from him, ranging from $2,000 to $3,000, and, if he did not settle immediately, it would cost him double that amount, and in all probability he would have to go to jail besides. Schuler protested he did not have that much money, did not know where he could borrow any such amount. Accused insisted the least he could settle the whole matter for would be $1,000.

The conference lasted about two hours. Accused finally drew up the two checks above described on the Tripp bank for $994, insisting that was the least the whole matter could be settled for. Schuler signed the checks and gave them to accused. Then Schuler and accused drove to Tripp in Schuler's car, arriving there about 5 o'clock in the afternoon of August 17th. Before reaching the bank, accused got out of the car, and Schuler proceeded alone to the bank and negotiated a loan, giving the bank as security a chattel mortgage on his personal property. Later, and between 5:30 and 6 o'clock that evening, accused appeared at the Tripp bank, presented the two checks signed by Schuler, and received in payment for them a draft for $994.

Accused admits receiving this draft from the Tripp bank in payment of the two checks, but his version of the date, the hour of the day when Schuler reached Parkston, and the time when he and Schuler went to the bank at Tripp to cash the checks, and what occurred at the conference in Doering's office, is, in substance, as follows: Early on the morning of August 18th accused was called by telephone to come to Dr. Doering's office. When he arrived there he found Schuler and Dr. Doering present. Schuler told accused he had talked this matter over with Dr. Doering, and Doering had told him, if he pleaded guilty before accused, a federal charge might still be preferred against him and a federal tax levied against him for quite a large sum, and such tax might be made a lien against his property. Doering had told him of one or two people in Hutchinson county on whom such taxes had been levied. Accused told Schuler he was not interested in that, and asked Schuler if he wanted to plead guilty to the charge of manufacturing intoxicating liquors, and Schuler said he did. Schu-

ler also said he did not feel easy in his mind, could not sleep nights, and his wife could not sleep. He wanted some protection, and Doering advised him to get Joe H. Kirby as his lawyer. At the repeated request of Schuler accused went to his bank and telephoned Kirby, telling him the troubles Schuler was in, and asking him if he would not look after Schuler's interest. Joe H. Kirby told accused he would do so if Schuler would deposit in the bank of which accused was cashier $500 for a retainer and $200 to pay any expenses Kirby might be to; and Kirby also said, if no charges were brought against Schuler, and he (Kirby) did no work in the matter and was at no expense, the money would be returned to Schuler. Accused testified he returned to Doering's office and told Schuler all Kirby had said. Schuler replied: "That is fine. That is what I want to do." The $700 check was then made out by accused and signed by Schuler. Schuler and accused then left Doering's office, and about 2 o'clock that afternoon accused drove with Schuler in his car to Tripp. They went to the Tripp bank during banking hours, and the Tripp bank paid the two checks by giving accused draft No. 722, on Commercial & Savings Bank of Sioux Falls for $994. Schuler then went home, and accused returned at once to Parkston in another car.

Accused testifies he reached his own bank in Parkston long enough before the regular closing time of his bank, which was about 5 o'clock p. m., to make a regular record on his bank books of this transaction on that day, write a letter to the county treasurer and mail him a check for the Schuler fine, write another letter to Joe H. Kirby and mail him a check for $700 for his retainer, and mail the Tripp bank's draft for $994 to the Commercial & Savings Bank of Sioux Falls; that these things were done by him in his bank before 5 o'clock p. m. on the afternoon of August 18th.

The importance to accused of placing this conference on the morning of August 18th instead of August 17th is apparent when the testimony is read. The undisputed testimony shows that at 9 o'clock and 25 minutes a. m. on August 18th the accused had a telephone communication with Joe H. Kirby at Sioux Falls. It further shows that no other telephone message passed between accused and Joe H. Kirby either on the 17th or 18th days of August. It is conceded accused had no right to receive, and has

offered no excuse for receiving, the $700 from Schuler, unless it was done in pursuance to a telephone message from Joe H. Kirby.

We will now consider the evidence bearing on the date when these transactions occurred. Corroborating accused, Dr. Doering testifies he was in the room with Schuler and accused during the entire conference. He remembers the conference was on August 18th, because of the rain on August 17th and because he went to Tripp on the train on that day to assist another dentist in performing an operation, and while in Tripp on the 17th he talked with Schuler and Schuler told him he had been raided the day before.

Kirby corroborated accused as to a conference over the telephone concerning Schuler, and says he received a letter and a check from accused dated August 18th, but he evidently bases his testimony as to the date of the conference upon the date shown upon the check.

Accused has produced his deposit slip, loose leaf ledger sheet, and some checks and letters, all of which show the entries were made in his bank on August 18th and the letters sending out the checks to pay Schuler's fine and Kirby's retainer and the letter sending the Tripp bank's draft were written on August 18th. Accused also points to the fact that the two checks drawn by him and signed by Schuler are dated August 18th and the paid stamp on them is dated August 18th.

Attorneys for accused argue Bentliff's testimony, that he filed the charge against Schuler on August 17th, and that it rained on that day, corroborates the testimony of accused. But the record also shows that the rain did not prevent Bentliff and Wood Smith from driving from Parkston to Mitchell on August 17th, and we cannot presume that it would prevent Schuler from driving from Tripp to Parkston.

On the other hand, the judgment drawn and signed by accused is dated August 17th. Accused attempts to explain this date by saying he drew this judgment and sentence immediately on receiving the complaint and without waiting to see the accused. If he drew the judgment and sentence before seeing the accused, or knowing whether or not he would plead guilty, this was certainly an unusual mode of procedure, and the failure on the part

of a judge to have so important an instrument as a judgment and sentence express the true date on which it was rendered shows at least a lack of appreciation of the importance of such a document.

It is conceded the checks were paid by the Tripp bank on the same day the conference was had in Doering's office. As to the time when the checks were paid, Schuler testifies positively it was after 5 o'clock p. m. on August the 17th. In this he is corroborated by the positive testimony of Fred Hirsch, president, and August Reich, teller, of the Tripp bank.

Besides the positive testimony of these three witnesses that the two checks were cashed between 5 and 6 o'clock on the afternoon of August 17th, the state offered in evidence a part of the "Register of Drafts Drawn" of the Tripp bank. The item offered is a part of an old style ledger, consisting of several large sheets securely fastened together; each page of this ledger containing 50 lines. The item received in evidence is near the middle of one of these pages. It shows that the last draft drawn by the Tripp bank on August 17th was a draft for $994, drawn to "First National Bank, Parkston," and sold to "W. C. Rempfer."

The original draft was offered in evidence by the state, and is dated August 17, 1922, and corresponds in every particular with the record of the "Register of Drafts Drawn" of the Tripp bank.

On the page where the writing offered in evidence is found, there are the entries of the drafts issued by said bank on 21 consecutive business days, the entries beginning with August 8th and ending with September 21, 1922, and no blank line is left on the page.

It appears by the undisputed evidence that the Tripp bank closed its business each day at from 4:30 to 5 o'clock in the afternoon. Drafts issued after that time were dated on the day of their issue, but were included in the business of the next business day, and all checks presented and paid after that time were stamped "Paid" with the date stamp of the next business day. It further appears from the evidence that each day's business was marked off or separated by parallel red lines extending at right angles across the columns, marked at top of page, "Amount," "Total," "Exchange," and "Total Exchange,"

and within these parallel red lines was included all the drafts included in that business day, and in the column marked "Total" in red ink just above the lower red line was given the total of the drafts issued for that day.

This draft register shows conclusively that the last draft issued and dated by the Tripp bank on August 17th was this draft for $994 to the First National Bank of Parkston, and that this draft was sold to W. C. Rempfer, the accused. It also shows conclusively that this draft was the first item included in the day's business of August 18th.

There were two drafts issued by the Tripp bank on August 18th, which appear below this item. The total amount of the three drafts included in the business of August 18th was $3,546.20, and this item includes the $994 draft.

The entries on this draft register of the Tripp bank fully corroborate the testimony of Schuler, Hirsch, and Reich that accused did not arrive at the Tripp bank with the check until after 5 o'clock on August 17th. We therefore hold the following finding of the referee is sustained by a clear preponderance of the evidence:

"Your referee finds specifically that the checks for $294 and for $700 were executed at Parkston in the afternoon of August 17th and were presented for payment at the Farmers' & Merchants' State Bank of Tripp, S. D., late in the afternoon of said date, and were cashed or honored by the issuance of a draft for the amount of $994; that this transaction at the Farmers' & Merchants' State Bank of Tripp occurred after banking hours and after all of the books of the bank had been closed and all balances had been made up; that the date on the checks, viz., August 18th, and the cancellation stamp specifying the same date, is accounted for by the fact that, on account of the lateness of the hour in the afternoon of August 17th and the closing of the records of the bank's business for that day, these items were carried forth on the next day's business. The court so finds from the records of the bank which are in evidence herein."

Little more need be said as to this charge. Heil and Wood Smith had told Schuler the day before, if he pleaded guilty before accused and paid his fine, no federal charge would be filed. Bentliff told accused the same thing that day. Both Schuler and ac-

cused knew when the $700 check was made out that there would be no federal charge brought against Schuler. When the $700 check was made out, accused had not talked with Joe H. Kirby over the telephone.

The letter to Kirby, the check, and the entry on the books in accused's bank appear to have been made to conceal the real purpose of accused, which clearly was to collect and retain an illegal and exorbitant attorney's fee for himself. This view is strengthened by the fact that Kirby held this $700 check from August 22, 1922, until October 10, 1922, and then gave it back to the accused without cashing it.

The $700 check was never cashed, but the money lay in the bank of which accused was cashier until May 24, 1923, and until these proceedings were begun to disbar him, when it was returned by the accused to Schuler.

All the findings and conclusions of the referee on the Schuler charge are sustained by a clear and undoubted preponderance of the evidence.

As to the John Kroeger charge, the referee found in substance that Kroeger was born in Russia and came to Hutchinson county with his parents when about 6 years old. His knowledge of the English language was meager, and the greater portion of his testimony was given through an interpreter. A little over a month after the Schuler incident, a raid was made on Kroeger's place and about the same things found there as on Schuler's place. While the officers were making the raid, Kroeger returned from Scotland, made a full confession of what he had been doing, and asked them to be easy on him. He was told by the officers to plead guilty before accused, and, if he did so and paid his fine, nothing further would be done in the matter, no federal charge would be pressed, and the matter would be wholly adjusted. The next day Kroeger went to Parkston to see accused, but did not find him. While at Parkston, he told Dr. Doering all about what had occurred, and asked Doering to have accused telephone him when he returned. That evening accused and Doering drove to Kroeger's farm. Accused told Kroeger his offense was very serious, and the thing for him to do was to fight the case, to go to Sioux Falls and employ the best lawyer he could get, if he did not, it would cost him a lot of money, something like $4,000; that

the state could impose a fine of $500 and the federal government would place a lien on his property for a revenue tax. He was further advised to employ Joe H. Kirby. He protested, but finally said, if he had to go, he supposed he had better do so, and went with Doering and accused to Sioux Falls in Rempfer's car. Arrived at Sioux Falls, accused went to Kirby's office, and Kroeger and Doering went to a restaurant for supper. Accused returned to the restaurant and told them Joe H. Kirby was in his office. The three then went to Kirby's office. On the way there accused told Kroeger Kirby wanted $1,500 to fight the case. To this Kroeger objected. At Kirby's office both Kirby and accused advised Kroeger he was in very serious difficulties. It was finally agreed that Kroeger should pay Kirby $1,250. Five hundred dollars of this he raised in cash by giving a note to the First National Bank of Parkston, which note was cashed by accused, and Kroeger then gave Kirby a check for $500 on the Parkston bank and a note for $750. The next day, October 13th, Kirby and Kroeger appeared before accused at Parkston, and Kroeger pleaded guilty to manufacturing intoxicating liquors, and was fined $250 and $34 costs and sentenced to 30 days in jail. The jail sentence was suspended. Kirby paid this fine to accused in a check, and Kroeger was discharged. A little later Kirby stopped payment on this check; and still later made a motion, without giving any notice whatever to any one, to set aside the judgment and sentence against Kroeger on a ground not necessary for us to consider here. This motion was promptly granted by accused, and the judgment and sentence against Kroeger set aside.

Accused, having been elected state's attorney of Hutchinson county at the November election in 1922 and qualified for that office, filed a criminal complaint against Kroeger on or about the 6th day of January, 1923, in the justice's court of Henry Rempfer, his brother, charging Kroeger with the same offense to which he had pleaded guilty before accused but a short time before. No arrest was made on this information until about February 19, 1923, and after Schuler had filed his affidavit in the disbarment proceedings against accused. The sheriff then arrested Kroeger and brought him to Parkston. Kroeger asked accused why he had been arrested, to which he replied he did not know; he had orders from the Mitchell fellows to arrest him. A day or so later,

in the absence of Kroeger, Joe H. Kirby appeared before accused and waived examination. At the next term of circuit court Kroeger pleaded guilty to the crime of having manufactured intoxicating liquors on October 11, 1922, was fined $250 and costs, and personally paid such fine.

The referee further finds that there is no evidence in the record that accused received any benefit by reason of his conduct; but it is apparent that Joe H. Kirby did benefit by the same, and, if the accused derived any benefit, it was indirectly. The referee concludes that the conduct of accused in the Kroeger matter was wrongful and unprofessional, that he was enabled to gain the confidence and trust of Kroeger by reason of speaking the German language, and that he betrayed that trust and confidence by using the circumstances of Kroeger's prosecution on the liquor charge to intimidate and coerce Kroeger for the purpose of extorting money from him.

We shall not further discuss the facts relating to this charge. We have carefully read the entire evidence, and, with the exception of the referee's finding that Joe H. Kirby stopped payment on the check for Kroeger's fine "about three or four weeks" after it was given, we think the findings are all sustained by the great weight of evidence. As to this finding, we think the evidence shows payment on the check was stopped very soon after it was given.

It is clear from the facts found by the referee that the accused acted as attorney in advising Kroeger in a matter that might have come before the accused as county judge, and which later did actually come before him as such judge.

[2] It is also clear that he used his knowledge of the German language and his position as an attorney to induce Kroeger through fear to give the $500 cash to Kirby. In other words, he assisted Kirby in obtaining a fee which seems to have been excessive and exorbitant, and which was obtained in a manner which, as to the accused, amounted to extortion (section 4238, R. C. 1919), and it was entirely immaterial whether or not the accused was seeking to obtain or did obtain any benefit or property for himself. If he assisted Kirby in obtaining the benefit, he rendered himself guilty thereby. In re Sherin, 27 S. D. 232, 130 N. W. 761, 40 L. R. A. (N. S.) 801, Ann. Cas. 1913D, 446.

As to (3), the E. H. Doering charge, the referee found that

Doering was a dentist residing in the city of Parkston; that in September, 1922, Deputy State Sheriffs Wood Smith and Jake Heil and Federal Prohibition Officer Chas. B. Bentliff raided the home of Dr. Doering with a search warrant and found "a large quantity of liquor, consisting of whisky, homemade beer, and certain wines"; that while the raid was in progress accused came to the "home of Dr. Doering and demanded to see the search warrant and advised the officers he was acting as attorney for Dr. Doering"; that Doering entered his plea of guilty before accused as county judge, and was fined $50, but no execution was ever issued, and the fine has not been paid; that the records in the office of the United States commissioner at Mitchell show that the accused acted as attorney for defendant E. H. Doering with Joe H. Kirby. The referee concludes that there was nothing unprofessional or unethical on the part of accused in connection with this matter.

Counsel for accused excepts to the finding that the prohibition officers found a quantity of "homemade beer" in Doering's residence and to the finding that accused appeared as one of the attorneys for Dr. Doering at the preliminary examination before United States Commissioner Reams. We have carefully examined all the evidence relating to this charge, and think the findings of the referee are fully sustained by a great preponderance of the evidence. We disagree with his conclusion.

The complaint in relation to this charge alleges "that accused was guilty of unprofessional and dishonorable conduct as an attorney at law, in that he advised and assisted in a matter which was pending before him as county judge or a matter which might be brought before him as county judge," and also in that he improperly and unlawfully used his office as county judge.

It is clear from the evidence that accused acted as attorney for Dr. Doering while the raid was in progress and stated to the prohibition officers that he was attorney for Dr. Doering. It is also clear that the charge described in the first warrant under which Doering was being raided was one "which might be brought before him as county judge."

It is also clear from the evidence that accused later appeared as attorney for Dr. Doering before United States Commissioner Reams on the same charge, and that as county judge he issued

two orders on the state sheriff demanding the return to Dr. Doering and the county sheriff of this same homemade beer and wine; that as state's attorney he failed to collect or attempt to collect the $50 fine he had imposed on Doering.

We think the accused was guilty of unprofessional and dishonorable conduct as an attorney at law in advising and assisting in a matter which might be brought before him as county judge and in failing to collect or attempt to collect the Doering fine while state's attorney.

To further discuss the matters relating to these charges would extend this opinion to unreasonable limits, and would serve no useful purpose. We find accused guilty on each of the charges.

Accused has offered evidence that he was born and raised in Hutchinson county, this state; that his father was president of the bank of which accused is cashier; also that accused is a high school graduate, a college graduate, and a law school graduate; also evidence that he has held many important public offices, such as state's attorney, county judge, bill clerk of the House of Representatives, assistant secretary of the Senate, and is at present member of the school board of Parkston. The testimony shows accused has had exceptional opportunities, many public honors, and considerable financial success. He was born an American citizen, and cannot therefore plead ignorance of American customs and ideals. He has had the advantage of a full course in our common schools, high school, and colleges. He was not ignorant of the duties of good citizenship. His father was president and he cashier of a national bank. He was not in want. He was graduated from one of America's most famous law schools in 1910 with an "L. L. B. cum laude," and has held many positions of trust and confidence; yet the record shows accused is seriously lacking in regard for truth, the rights of others, loyalty to his clients, and appreciation of his duty to the ignorant and unfortunate, who had a right to rely on his counsel as an attorney, his fairness as a citizen, and his probity as a judge. He has used his superior talents and opportunities, not to protect, but to prey upon those whom he should have protected as a lawyer and as a judge.

[3] The relation of an attorney and client is one of the highest trust and confidence, requiring an attorney to observe

the utmost good faith and not to allow his private interests to conflict with those of his client.

"By admitting an attorney to its bar, the court presents him to the public as worthy of its confidence in all of his professional duties and relations. If afterward it comes to the knowledge of the court that he has become unworthy, it is its duty to withdraw that indorsement and thereby cease to hold him out to the public as worthy of professional employment." Serfass' Case, 116 Pa. 455, 9 A. 674; In re Elliott, 18 S. D. 264, 100 N. W. 431; In re Ramsey, 24 S. D. 266, 123 N. W. 726.

It is the judgment and order of the court that the name of the accused be stricken from the rolls and his license revoked.

CAMPBELL, P. J., and GATES, POLLEY, and BURCH, JJ., concur.